1-23-0771 People v. Richard Jones 1-23-0771 People v. Richard Jones 1-23-0771 People v. Richard Jones 1-23-0771 People v. Richard Jones In less than the time it will take me to introduce this case, Richard Jones had to decide how to respond to being pepper-sprayed, punched, choked, and stabbed by Anthony Houston, who was 6 inches taller and 70 pounds heavier than Jones. Houston attacked Jones with pepper spray after waiting less than a minute for officers to arrive after calling 911, and in the fight that ensued over the next 60 seconds, Jones was, as he testified, in fight or flight. Because Houston was the initial aggressor, the law permitted fight and did not require flight. In reaching the contrary conclusion and sentencing Jones to 18 years in the Department of Corrections for the offense of second-degree murder, the trial court committed four errors that this court should correct, two of which I plan to discuss this morning. First, this court should reverse Jones' conviction outright, where the state failed to disprove any of the elements of self-defense beyond a reasonable doubt. Second, and alternatively, this court should reverse and remand for a new trial, where the trial court erroneously admitted Houston's 911 call as an excited utterance, and the error was not harmless. I am, of course, happy to take questions about Arguments 2 or 4 in the briefs as well. But turning first to reasonable doubt, as I said, this court should reverse Jones' conviction outright, because the state failed to disprove the elements of self-defense beyond a reasonable doubt. But before diving into how the elements of self-defense work in this case, I want to spend some time setting out the timeline of events that led to Mr. Houston's death. So we know from the surveillance video that the time from when Mr. Jones arrived at the scene to when he stumbled out of the vestibule to treat his pepper spray injuries in the snow was about three and a half minutes. We know that Mr. Jones was on the stoop of the apartment building for about two and a half of those minutes. And of those two and a half minutes, we know from State's Exhibit 51 that Mr. Houston's 911 call was a minute and 40 seconds. So from those facts, we know that Mr. Houston waited less than a minute after calling 911 before opening two locked doors and pepper spraying Jones in the face. After that, Mr. Jones entered the vestibule and a physical fight ensued. During the physical fight, Jones pulled a knife which dropped on the floor. And here I would like to pause to correct a factual assertion from the State's brief that forms a central component of many of its arguments. The State argues, citing pages 440 and 441 of the report of proceedings, that when Mr. Jones entered the vestibule, he was already swinging the knife. But at that page of the report of proceedings, Mr. Jones has not mentioned the knife anywhere in his testimony at that point as an item that he was swinging. And later in the State's own cross-examination, I would direct the Court specifically to page 445 of the report of proceedings. The questions reveal that Mr. Jones had in fact not drawn the knife at the time that he started swinging his fists at Mr. Houston. And why is that fact so critical in the State's argument? It's critical because the State emphasizes both in Argument 1 in its brief and in Argument 3 in its brief that Mr. Jones's actions in response to being pepper-sprayed were neither necessary or proportional because his response to the pepper-spray was to immediately draw and start swinging the knife. But the proportionality analysis will be informed by the level of action that Mr. Jones took in response to initially being pepper-sprayed. Well, Mr. Jarka, I guess it's just so we're clear, it's your client, Mr. Jones, who brought the knife to the scene, right? Correct, Your Honor. So he brought the knife. He used the knife. And we have this other situation where whether you call it two and a half minutes, whether we limit it to two and a half minutes on the stoop, but during those two and a half minutes on the stoop, Mr. Jones is threatening the victim. Yes?  Yes, so that's correct. And I don't mean to put off Your Honor's question, but I'm happy to address the threats. I do want to finish putting the timeline in context. And then when we talk about – because the timeline is important in this case. With the timeline in context, the arguments about the initial aggressor and the reasonableness of the belief make a lot more sense. So once Mr. Jones has fought his way into the vestibule, as witnesses testified, using his fists, he draws and drops a knife on the floor during the physical fight. And Mr. Houston recovers the knife and then, according to Jones's testimony, stabs him. That testimony is corroborated by the state's exhibits, photographs from the lockup. And then after – eventually Mr. Houston either kicks or knees – or Mr. Jones either kicks or knees Mr. Houston in the groin, he drops the knife. Jones recovers the knife. And Jones, at that point, who could only see what he described as a blurred figure, starts swinging rapidly in an attempt to get back out of the vestibule. So with those facts in mind, I'm happy to turn to Your Honor Justice Navarro's question about what it means for Mr. Jones to have been the initial aggressor in this case. So one of the trial court's principal errors that the state repeats on appeal is concluding that Jones was the initial aggressor functionally for being aggressive and loud on the stoop of the apartment building. But as this court made clear in People v. Slaughter, mere words, no matter how abusive, are not sufficient to constitute provocation under the self-defense statute. And Your Honor mentioned the fact that Mr. Jones arrived at the apartment building with a knife. But neither the two eyewitnesses who were outside of the vestibule at the time that Mr. Jones arrived, nor Mr. Houston in his own 911 call, described seeing Mr. Jones with a knife. And that's a critical fact that distinguishes this case from cases like People v. Cruz. In Cruz, the defendant and the victim were in close quarters on a city bus. The defendant directly threatened the victim to fight the victim when they got off the bus and brandished a knife before eventually backing off and then re-approaching the victim before the victim punched the defendant. And there this court found that the victim, even though he struck the first blow, was not the initial aggressor, in large part because of the combination of the words that the defendant had used and the brandishing of the knife. Am I right that it would not be critical to the State's case even if your client was not the initial aggressor? Because if the response was not proportional, which is what the court essentially found, he would still be guilty of second-degree murder. Is that correct? It is correct, Your Honor. I have two responses. The first is that the question of who is the initial aggressor, in terms of when Mr. Houston became aware of the knife that Mr. Jones had, is critical to the State's case. The State argues principally and faults Mr. Jones throughout Argument 1 of its brief for not leaving the scene. But the case law and the pattern instructions for self-defense and first-degree murder make clear that if Mr. Jones was not the initial aggressor, he had no duty to retreat. So the time at which Mr. Houston became aware of the knife is critical to the State's case. It also informs the proportionality analysis that Your Honor mentioned. So when it comes to proportionality, going back to the timeline that I brought out at the beginning, we have Mr. Jones yelling profanities, making threats of an unspecified nature while he's on the stoop, having not brandished a weapon yet. And then Mr. Houston comes and commits what this Court has described as an aggravated battery by pepper-spraying Mr. Jones in the face. But I guess it's, as opposed to Cruz, who they're on a bus, Mr. Houston doesn't come anywhere. Mr. Houston's at home. So where is he going to retreat to? If he's at his, whatever you want to call it, the residence, the workplace, he's home. So I would say there's nowhere for him to retreat to because he's essentially already retreated. He's behind two locked doors that Mr. Jones cannot access. Both eyewitnesses testify that Mr. Jones was unable to access the front door, enter the front door, either by knocking, pushing on it, whatever his actions look like on the video, or by using the keypad to be allowed entry. And we know from State's exhibit, I believe it's 33, it's a photo of the crime scene, show keys in the door of apartment 106. So we know from that that the apartment door locked. We know from Officer Wilson's body camera video that the front door locked because she had to use her own knife to jimmy the door open when she arrived to administer first aid. So Mr. Houston, at the time he is calling 911 and deciding to go and use pepper spray, even though he didn't ask Mr. Jones to come there that day, is still in a position of relative safety at the time that he decides to commit an aggravated battery by using the pepper spray. And again, that goes to the proportionality. Mr. Jones responded to the pepper spray with a physical fight, throwing fists. He said Mr. Houston was choking up on him. And that goes to my second point about the reasonableness of Mr. Jones' belief in the need to defend himself. So we cited cases- But the counsel, he also pushed his way into the residence as well. So not just defending himself, but then becoming an aggressor at that point. So I think the only way the court could find that Mr. Jones' act of pushing his way into the vestibule was an act of aggression is if this court finds that the pepper spray was not. Because if the pepper spray is the act of initial aggression, then Mr. Jones was not obligated to leave and was permitted to use force to defend himself under the law at that point. And because the response to the pepper spray was fists and not the knife, the response to the initial use of the pepper spray was proportional. And then once the fight begins, we cited cases like People v. Woods and People v. Estes in the briefs that talk about how a physical size differential between the person who is the initial aggressor and the person claiming self-defense can allow the use of deadly force before the person who was the aggressor even gets hold of a weapon. So once the physical fight had started, again, Mr. Houston is 70 pounds heavier and six inches larger than Mr. Jones. Underwoods and Estes, Mr. Jones did not have to wait for Mr. Houston to get a hold of his knife before he could use the knife in response to the force that Mr. Houston was using during the physical altercation. But, of course, Mr. Houston did get a hold of the knife and, as Mr. Jones testified, stabbed Mr. Jones before he was able to recover the knife and get out of the vestibule. So based on this discussion, our position is that the trial court erred both in finding that Jones was the initial aggressor and that his belief in the need for self-defense was not reasonable. And the trial court's error as to those two elements of self-defense really inform the errors that it committed and that the state repeats on appeal as to the remaining elements of self-defense. So I'll run through a couple of those really quickly before moving to the evidentiary issue. First, the state argues that the harm to Jones was not imminent because he chose to fight his way into the building. This goes to Justice Johnson's question earlier. Because Mr. Jones was not the initial aggressor, he had no duty to retreat. So the state's repeated critique of Mr. Jones for not leaving the scene after being pepper-sprayed is simply inconsistent with Mr. Houston's role as the initial aggressor. The state also argues that the use of deadly force was not necessary because Jones began the attack. But as we've discussed, Jones certainly showed up at the apartment building first, but the person who began a physical attack was Mr. Houston. And because Jones' presence at the front door of the building was not sufficiently provoking under the self-defense statute, Mr. Houston's use of the pepper spray was the initial aggression and therefore the beginning of the attack. But it's not just Jones. We can't just say Jones is standing outside lurking or standing on the stoop. He's yelling, pounding on the door while armed. Whether or not the victim knew he was armed, he's yelling and pounding on the door. So it's a little different than just being outside or being at the location, right? I agree it's probably one step above the words alone cases, but it's several steps below the cases like people versus crews where the defendant is in close proximity with the victim, has made specific threats about fighting the victim as soon as he's able, and has actively brandished the knife. And I think embedded in Your Honor's question is an important point is that it does matter whether or not Mr. Houston had seen Mr. Jones with a knife yet because the proportionality of Mr. Houston's response to Jones' presence at the front door would be judged by the facts that he was aware of at the time that he chose to leave his apartment and to use the pepper spray. And then the final error that I would point out that the trial court made as the self-defense elements and that the state argues is that Jones' use of force was not proportional because Houston only got the knife after Jones started swinging it. Again, going back to our discussion of pages 440, 441 of the report of proceedings together with 445, that argument is based on an erroneous factual premise. And as we discussed, Mr. Jones would have been justified in wielding the knife in response to the physical altercation that was taking place in the first place. And the state's own cases even stand for that principle, specifically People v. Delick. And I know we dropped a footnote in the reply brief explaining our position on Delick vis-a-vis Rule 23. But to the extent that this court finds Delick persuasive, it's essentially the factual inverse of this case. In that case, the defendant was bigger in size than the victim. The defendant was the only one who ever had control of the weapon. Here, on the other hand, Mr. Jones was the one who was at a size disadvantage. And, of course, Mr. Houston did get the weapon during the course of the fight. So even the state's own cases demonstrate the concept that Mr. Jones' response to the physical fight with Houston was proportional even before Mr. Houston got control of the knife. And to wrap up the reasonable doubt argument, the overarching error that the trial court made and that the state makes on appeal is to ignore this court's instruction in People v. White, which is that the law does not charge a person confronted with aggression with using inerrable judgment in how they decide to defend themselves, especially in a short time span and under great stress. And that is all Jones had in this case, 60 seconds to decide how to respond to being pepper-sprayed, punched, choked, and stabbed by a man much bigger than him. On these facts, Jones' belief in the need for self-defense was reasonable, and this court should reverse his conviction for second-degree murder outright. That said, even if—oh, sorry, Justice Johnson. Can you address or clarify the defendant's purpose behind, you know, arriving at the residence? Yes, thank you, Your Honor. So the state makes much of the statements that Mr. Jones made in the body-worn camera video and in his statement to detectives at the police station about how much he—about his personal belief, erroneous belief, that Mr. Houston had sexually assaulted a woman named Sarah and his expressed desire to kill Mr. Houston. That evidence is certainly relevant if we zoom out to what the state's initial burden was in this case. So remember the state's initial burden in any self-defense case is to establish the elements of first-degree murder beyond a reasonable doubt. So all of that evidence is certainly relevant to proving Mr. Jones' intent, which is an essential element of that. But by the time we get to an analysis of second-degree murder and self-defense, the intent to kill is a given because the state has to have proven first-degree murder beyond a reasonable doubt before we even shift to analyzing self-defense. And as this court has made clear—I'm sorry, I don't—the cases are cited in the briefs. I don't have them right off the top. Oh, People v. Jordan, People v. Williams, we cited those in the briefs. The question of the reasonableness of belief in the context of self-defense is related to the reasonableness of the belief in the necessity of the force used. So Jones could have harbored any views about Mr. Houston, as much animus towards Mr. Houston as he wanted, but the question is whether his response to the physical assault he experienced was reasonable and necessary. But doesn't that also support the theory that he, in going to the residence with the intent to injure or kill the victim, that he was actually the aggressor? It would if the pepper spray had never happened. So the pepper spray is an important intervening fact in this case that Mr. Jones was not obligated to ignore or allow himself to experience, especially because we don't know, based on Houston's 911 call, the nature of the threats that were being made, unlike what we know from People v. Cruz. So, again, I think the nature of Mr. Jones' post-incident statements are certainly relevant evidence that the state was permitted to use to prove intent to kill in the first place when we're talking about first-degree murder. So if someone expresses an intent to harm or kill me, you're saying I don't have a right then to pepper spray them in order to encourage them. I'm putting it lightly, but encourage them to fall back or to ensure my own safety. I then become the aggressor? You would have that right if that intent was expressed to you. Unfortunately for the state's case here, Mr. Jones' intent, as far as the record reveals, was never expressed to Houston. He expressed it many times and vocally to officers, both on the scene and when he was being interrogated, but never to Houston. But, counsel, you stated that we didn't know exactly what the threats were when he was yelling on the porch. So it could have, or a reasonable trier of fact could find, that those threats were directed towards the victim, correct? I disagree, Your Honor. I don't think it's a reasonable inference without more information about what the threats actually were. And, again, distinguish this case from People v. Cruz, where the defendant expressly told the victim, I will fight you when we get off this bus. We know the content of the defendant's threats. We know the imminence of the defendant's threats in that case. We have none of that information based on the record in this case. And the inference would not be reasonable because it would be based on speculation. Well, we know from the 9-1-1 call that the victim is calling 9-1-1 because he feels he's being threatened. Correct, Your Honor. We don't know, again, though, we don't know the nature of the threats. We don't know if it's a threat to kill. We don't know if it's a threat to fight. We don't know if it's a threat to contact Mr. Houston's employers about this perceived sexual assault that took place with one of the Thresholds residents. I mean, there's so much content that the word threat could have that it would be unreasonable to fill in that word with information that's just not in the record. And so if there are no other questions about reasonable doubt, I will turn to the evidentiary issue. Even if this court finds the evidence sufficient to prove Mr. Jones guilty, it should nonetheless reverse and remand for a new trial because the trial court erred in admitting Houston's 9-1-1 call as an excited utterance and the error wasn't harmless. So when it comes to this issue, the parties largely agree about the basic legal framework that governs the analysis. Excited utterances are only admissible as a narrow exception to the rule against hearsay statements, and there are three factors in the rule that govern the admission of excited utterances. First, the statement must relate to an occurrence that was sufficiently startling. Second, the statement must be contemporaneous with the event. And third, the statement must relate to the purportedly startling event. In here, only one of those factors, the first one, is disputed between the parties. Mr. Jones's presence at the front door to the apartment building was not sufficiently startling to invoke the excited utterance exception. And to sort of go down those facts again, I take no dispute with, Justice Navarro, the facts that you mentioned, which is that Mr. Jones was at the front door, banging on the door, typing on the keypad, yelling, using profanity, and making unspecified threats to Mr. Houston. But the facts that militate against a finding that the excited utterance was proper is that Mr. Jones was not able to get into the building on his own, either the main front door or Mr. Houston's door. His behavior did not inspire the two eyewitnesses, who were not protected by two locked doors, to either leave the area or call 911 themselves. And at the time of the 911 call, this bears repeating both for the reasonable doubt issue and this one, neither of the eyewitnesses nor Mr. Houston had seen Jones with a weapon of any kind. And that's from the 911 call itself. The two witnesses that were walking the dog, didn't the male tell the female to wait here while he went to check it out or see what was going on? My memory of the record, Your Honor, is that that was after the altercation was over and Mr. Jones had stumbled back out of the vestibule. I think he was asking her to wait while he went to check on Mr. Houston after the incident was over. And at that point, we already knew that Mr. Houston had been stabbed. Did you cite any cases in which a 911 call was found to not be an excited utterance? I'm not sure we cited any 911 cases specifically, Your Honor, but we pointed to cases like People v. Abram, which discussed the idea that observing a fistfight or seeing someone possessing a weapon are usually not sufficiently startling events. Here we have even less than that because Mr. Jones had not yet engaged in a physical altercation with anyone and no one had seen a weapon. And Abram specifically instructs that it usually takes an event several orders of magnitude higher in the capacity to startle or alarm than even those types of events or the police chase that took place in Abram itself before the excited utterance exception can be invoked. And I will acknowledge the State cites two cases in its brief that says physical harm is not required first before the excited utterance exception is allowed to be invoked. And the State argues that we look instead to the totality of the circumstances. I don't quarrel with that legal proposition, but the court should look to the totality of the circumstances that were present in both of the cases the State cites. So, for example, in People v. Conley, the defendant had battered the victim, had been in a verbal altercation at close range, and at the time that she made the statement had taken her child, put the child in the middle of the street, and by the time the officers arrived, left with the child. So the victim's statement was made at a time when she had been physically battered and her child was missing. And then in People v. Robinson, it was another domestic case where the defendant was still on the scene with the victim, the scene was chaotic, there was a hole punched in the wall, blood spattered everywhere, the defendant was bloody, and there was broken glass. And again, the victim had reported being battered by the defendant. So even the cases the State cites, if we look at the totality of the circumstances, are again several orders of magnitude less in their capacity to shock or alarm than the type of situations that this Court acknowledged in People v. Abram might be sufficient to invoke the excited utterance exception. When we're looking at Judge Lynn's decision to allow this evidence, what's our standard of review that we've been looking at? The standard of review is abusive discretion, Your Honor. So we acknowledge that that's a deferential standard, but there's simply no cases that I've been able to find that the State has cited where a situation that's as relatively benign as the one present here has been held to be sufficiently startling to invoke the excited utterance exception. So in the absence of any authority applying the excited utterance exception to facts that are similar to these, we would argue that it was an abusive discretion to admit the 911 call as an excited utterance. And importantly, the error in the trial court's admission of the excited utterance was fully preserved, so it is the State's burden on appeal to show that the error was harmless. As explained in the briefing, even if this Court finds the evidence sufficient on the elements of self-defense, it was at least closely balanced, especially when it came to who was the initial aggressor and whether Mr. Jones' belief in the need to defend himself was reasonable. And more importantly, the trial court expressly relied on the 911 call and its guilty findings, specifically when it was deciding that Mr. Jones was the initial aggressor. It looked to the 911 call to invoke its description of Jones as having a threatening presence at the front door to the building. So the 911 call was a central component to the trial court's reasoning for rejecting Mr. Jones' self-defense claim. And finally, the State's arguments on appeal show reliance on the 911 call in its defense of the judgment below. And while the State points to other aspects of the 911 call that were corroborated by other witness testimony, for example, the mere presence of Jones at the front door, the yelling, the profanity, the only evidence that Jones made a threat of any kind, specific or nonspecific, came from the 911 call. And so it doesn't repeat any evidence that was otherwise admitted by the State against Mr. Jones at trial. So if the court has no other questions about the evidentiary issue, I will conclude by saying that the... Oh, sorry, Justice Johnson. So someone's yelling, banging, making profane statements on your front door. You decide to call the police. What determines whether you're excited or not at the time? Doesn't the mere fact that you're calling the police to report this mean that you have some raised level of at least concern? I think it's fair to say that Mr. Houston was concerned, but this court has said, and again I would point to cases like People v. Abrams, the sort of colloquial sense that we think of concern or excitement is not the same as sort of what it means to be excited, to invoke the excited utterance exception. So the excited utterance exception looks not only to whether the person who made the statement, him or herself, was excited. The question is whether the circumstances are sufficiently startling to quiet reflection. And again, this court has looked only to situations that are, to quote Abrams again, several orders of magnitude higher in their capacity to shock or alarm when blessing the invocation of the excited utterance exception. But isn't that subjective depending on the person? What may cause me to be excited might not cause you to be excited. I think that's exactly the problem, Your Honor, in looking too heavily at whether Mr. Houston himself sounded excited. And again, the standard for the exception is whether the circumstances were sufficiently startling or alarming in their capacity to shock or alarm. So the primary inquiry for the excited utterance exception is a much more objective one. And I think if this court were to apply a subjective inquiry, we would run the risk of the exception swallowing the rule because someone could just call 911, speak in a loud voice, and all of a sudden their hearsay statements are admissible because they sound excited on the phone. But the question is not just whether they sound excited. This court has looked to that as a factor. But the ultimate question under this court's case is whether the event itself is sufficiently startling in its capacity to shock or alarm. And again, if there are no questions, I'll just conclude with this. I'm not standing here to deny sort of the tragic circumstances of this case. But at every stage, the trial court miscalibrated the effect of Jones' presence at the front door to the apartment building. His actions before Houston pepper sprayed him were not sufficiently provocative to defeat his claim of self-defense, and they were not sufficiently startling to justify the admission of Houston's 911 call as an excited utterance. So for those reasons, those in the briefs and discussed this morning, we ask this court to either reverse Jones' conviction outright, reverse and remand for a new trial, or vacate his sentence and remand for resentencing. Thank you, counsel. Thank you. Appellee may proceed. Good morning, Your Honors. Counsel, may it please the court. Paul Wysicki on behalf of the people of the state of Illinois. Good morning. Important in this case is the standard of review. How do we look at the evidence here? How does this court look at the evidence? What is the court's mindset? It is to look at the evidence in a light most favorable to the verdict, the verdict of guilty of second-degree murder. It is to look at the verdict in a light most favorable to the state. And it's only, only if no rational person could find the defendant guilty beyond a reasonable doubt on these facts that the court may reverse. We've heard an argument from counsel that looks at the facts from anything but a light most favorable to the state. Counsel's entire argument is premised on his client's testimony, essentially. That is the linchpin in the testimony. He says his client used the knife only after he was pepper-sprayed, punched, choked, and stabbed. Well, the record doesn't back that up. One, we know the defendant was never stabbed. He had a couple of cuts, surface cuts that were treated. He wasn't stabbed. And there is a big significant difference, and we certainly know that from what Mr. Houston expired. Defendant says he was choked. How do we know that? Why should we believe defendant? And why should the trial court believe defendant? Where do we start with this process? Defendant says at trial, oh, you know, I went to the apartment building to see Kai, my old girlfriend. I have this ring. We broke up. I have this ring I want to give back to her. Reasonable enough? So one goes to the apartment building, would ring Kai's buzzer or try to contact her. She's not home. What do you do? You go home or go elsewhere because Kai's not there. But what does this defendant do? He causes a spectacle, profanity, yelling, screaming, pounding, buzzing, buzzing, buzzing, doing everything he can to try to get into the building. Was he there to see Kai? Of course not. Would any reasonable, rational trier of facts say that this guy was there to return a ring? Of course not. Defendant was there, and he told us why he was there. He was there to get Mr. Houston. He was there to get into that building and get Mr. Houston. We know this from his conduct. We know this from the profanity, from the screaming, from the yelling, from the standing there for several minutes trying to work his way into the building, a building that didn't just house Mr. Houston but housed the Thresholds residents, people who are in need of special assistance in their day-to-day lives. Mr. Houston had a responsibility to the people of Thresholds. He was responsible for them, for their safety and well-being at a certain level. He wasn't a security guy. Let me just ask you a couple questions about the record. First of all, is counsel for the appellant correct that we don't know the specifics of what the threats were from outside the door? We don't have a verbatim transcript of the threats, but we do know that the threats or the most likely inference, the most reasonable inference, and certainly a not irrational inference is that they were threats of harm, threats of violence. Why? Because you don't call 9-1-1 if the guy is just – you don't call the cops if the guy is threatening to report you engaging – So based on the 9-1-1 call, that's the evidence you have that the threats were of physical harm of some kind? The 9-1-1 call, defendant's conduct of using profanity and screaming, banging on the door, banging, trying to force his way into the building, hitting the pad. I think the totality of circumstances, in addition to the 9-1-1 call, strongly support the inference that the threats were threats of violence. And then in terms of what happened once he got in the door, other than the defendant's recitation of what happened, what other evidence, if any, do we have? Well, we have the eyewitness evidence of the men scuffling, tussling in there. We have the evidence that Mr. Hewson ended up with eight stab wounds and three cuts, and defendant three – he said three would have been described in the record as cuts, for which he refused medical treatment twice, which he didn't need or want medical care for, which he said, I'm fine about. So the record doesn't support much of any of defendant's testimony. Certainly when it comes to his justifications for his conduct being something less than the intent, simply to go there and kill Mr. Houston. Was the defense at trial defense of others, so that the victim wasn't there defending himself? He was defending other residents under threat? No. There was no argument that the victim was acting in self-defense or in acting in defense of others from that standpoint. From a totality of the circumstances standpoint, the court looked at the situation and said he looked at Mr. Houston's role, and he looked at the situation that Mr. Houston was confronted with, and he found that under the totality of the circumstances, defendant put the ball in motion. Defendant lit the fuse of what turned out to be a catastrophic situation. Defendant raised the intensity. Counsel at some point used the word benign to describe the situation leading up to the murder of Mr. Houston. There was nothing benign about defendant's conduct here. He went there, and we know he went there with the intent to harm Mr. Houston because he broadcast that intent repeatedly right after the incident. After the fact. Right after the fact, yes. But intent alone is kind of irrelevant at this point, is it not? I mean it's relevant, as Mr. Jarkub acknowledged, to the murder premise of the self-defense. Well, I'm going to take issue with the term irrelevant only because I think that it is proper to look at the totality of the circumstances and what the evidence tells us about the totality of the circumstances. Whether or not his intent was to go and harm Mr. Houston informs the question of whether or not he threatened Mr. Houston and whether he threatened Mr. Houston in terms of harm. Again, as the fact finder, the trial court looked at all of the evidence and drew inferences. But Mr. Houston was safe, and then he took the next step of opening the door and assaulting the defendant. He did. So he makes the 911 call, and at some point, police still aren't there. He decides he's going to go. And I think clearly he was trying to get defendant to leave. He opens the door, sprays the pepper spray. See, counsel made much of the fact that Mr. Houston was larger than defendant, and this put defendant in all kinds of fear and stuff, but nothing that Mr. Houston did, even by defendant's own description, suggests that Mr. Houston went after the defendant to physically assault and harm him. He hit him with the pepper spray, and why would one do that? I mean, if a woman's out jogging and someone's harassing her, she hits them with a pepper spray. Is that some indication that she's going to try to physically assault the man? But that's a little different because she is not behind two locked doors. He was safe behind two locked doors. He had called 911, so he knew someone was on the way. You know, why doesn't he then become the aggressor when he went out of his way to go out and, you know, physically approach or assault the defendant? I think the reason gets us back to the totality of the circumstances situation, Mr. Houston's role at the building, and the fact is this is a multi-unit apartment building. We've got thresholds residents. We know two of the eyewitnesses were out there, and they saw what was going on. So we have all kind of people coming in and out of this building, and I think the most logical inference to draw, the most reasonable inference to draw, that Mr. Houston went out there to disperse the defendant because he was concerned not only about his own safety, but the safety of others, and we don't know. Ironically, how did the police make entry to the building? With a knife. What was defendant carrying? A knife. Sooner or later, he probably would have been able to do the same thing, that the police didn't use the knife to gain entry. Mr. Houston decided not to wait around for that to happen and tried to disperse the defendant. But there was also another witness that spoke about Mr. Houston having a propensity for, you know, I guess assaulting or wanting to fight others or stab others, carrying a knife of his own. So can you speak to that, please?  So that was an incident that reportedly happened ten years before this incident, and it was between Mr. Houston and one of his coworkers at a facility out in Tinley Park. So, yes, there was that story that they were going to get together. One thought it would be a fist fight. Turns out Mr. Houston brought a knife. The other guy had a knife. They started fighting. Coworkers separated them. Okay, there was that incident, right? But let's look at the situation here. Did Mr. Houston come out with a knife? Nope. He had pepper spray, and I think the record shows pretty clearly he was using it defensively. He didn't open that door, yank the defendant into the building, spray him with pepper spray and start pummeling him. He opened it, squirted him, and I'm certain hoping that this would cause the defendant to leave. That's the only rational conclusion to be drawn here. If Mr. Houston intended to physically assault, attack defendant, oh, you're going to come and bother me? Well, I'll give you what's for. He would have opened that door, grabbed the defendant, pulled him in again, right? We hear the defendant was a mere 5'6", while Mr. Houston is this towering 240-pound man. Well, about my size, actually, so I wouldn't say towering. But he would have grabbed him. He would have gone and gotten him, but he didn't. He didn't. He squirted him, and it was the defendant who said, oh, I'm going to get you, because that's what I'm here for. The defendant charged on in there. And then the only thing that we really know happened after that is that Mr. Houston got stabbed eight times, including in the neck a couple of times, around his face and head, and cut three more times. And we don't know the story as well. The knife just fell out of my pocket after he happened to be choking and punching me. And even though I couldn't see, I was able to land a precision blow right to Mr. Houston's testicles, which forced him to drop the knife. Defendant spins a good yarn, but I submit that on the evidence, that's what it was, and that's what the trial court recognized it to be. The trial court didn't find the defendant's description of what occurred credible because it didn't add up with facts that were not in dispute. Defendant's conduct outside on the stoop. Certainly made no sense in light of his explanation, oh, I was just there to return a ring. His profanity-laced speech, his antics, none of that adds up. His decision not to disperse, but to charge in after Mr. Houston, the first chance he got. So I think it's clear here, the trial court, again, looking at the totality of the evidence, which was its obligation to do as fact finder, and to weigh that evidence and to make credibility determinations, drew reasonable inferences. Remember, could no rational person find defendant the aggressor in this evidence? No, not a single rational person could ever do that on this evidence. I have two questions, and just whether you agree or disagree with Appellant. Appellant said that the trial court found that the defendant was the initial aggressor. I did not necessarily read the trial court's finding that way, nor do I think that's necessary to upholding this conviction. But do you agree that the trial court found that the defendant was the initial aggressor? I thought he said, I don't really know which happened first. These two things kind of happened at the same time and then went on. I'm going to grab my water. Yes. Yes, I do agree that the trial court found that the defendant was the initial aggressor. And I think one of the reasons, or so as I went back and looked at that record, that's where I saw that the trial court really zeroed in on this concept of totality of circumstances. When I look at everything, when I look at everything that was presented in evidence, I conclude that the defendant was there for trouble, he was going after Mr. Houston, he was the initial aggressor, he was the guy who put the whole ball in motion, put Mr. Houston in this mindset of being stressed and afraid for his safety, and I think fairly also the safety of other people traversing the building. Okay, so in your view, long before the pepper spray, all the threats and standing on the porch is aggression and made him the initial aggressor, or that's what the trial court found? I think the whole, yes. Okay. And then the other question is, and you may have cited cases, they may have cited cases, but is the use of pepper spray, going back to Justice Johnson's question of the jogger who uses pepper spray, is the use of pepper spray an act of aggression or can it be a defensive act? I think it can be an act of aggression and it can be a defensive act, and I think we have to look. I think the context will inform us as to which obtains. So if we look at the context here, Mr. Houston is confronted with defendant's conduct, vulgarities, threats, banging, trying to force his way in, hitting the butt, et cetera, et cetera. He makes his 911 call. He then decides, listen, I've got to do something more apparently, and he goes out there. Again, he didn't open that door, spray him, and jump on defendant. It was the opposite. He sprayed the defendant to get him out of there, and yet defendant brought the fight to Mr. Houston. I think if he were going to use the pepper spray aggressively, it would have been pepper spray plus. It would have been pepper spray and then he would have punched or grabbed or forced this guy. He would have pulled him into the vestibule, but that's not the story. The story is, well, I'm in this fight or flight mode, and I decided to charge forward, and we're fighting our way into the vestibule. I think if Mr. Houston was going after the defendant, any fight that would have occurred would have happened outside the building. I think he would have had the momentum of force going toward the defendant, and that would have been his way to overcome him, especially being a larger man. He would have been able to then use that to his advantage, but by— But being a larger man, shouldn't he have been able to pepper spray and close the door back if he was not interested in engaging with the defendant? One would hope, but that's not how this turned out. Well, you gave us several scenarios that could have happened, and so I posit that that's a scenario as well, that he could have reached out, sprayed, and closed the door back and went back in. Yeah, and somehow the defendant got the better of that. Once the door was open, now the defendant literally has an in, and the defendant says he charged forward, he didn't drop back. So if the defendant had just stepped back, perhaps that's exactly what would have happened. He would have squirted and closed. But by defendant's testimony, he says he charged in, and while I take issue with much of his testimony for the reasons stated, this kind of makes sense. So one of the hardest things to do. Don't believe this, but believe that. But the way you can make this argument and why it makes sense is because of the totality of the circumstances, situation. Because your point's an excellent one. Well, why didn't he just close the door right away? And I think the only explanation we have in the record is that defendant wouldn't let him do that. You know, interesting, well, I'll save that for if we have sentencing questions. Or the victim has never run away from a fight. Pardon me? Or the victim has never run away from a fight. He's never met a fight that, you know. Well, you know, I suppose, but you'd think he'd be better at it if that were the case. You'd think he would have done something to work to his advantage, and it doesn't seem to have worked out that way. And especially, right, I mean, if defendant, he doesn't know defendant's armed. Perhaps he has no reason to suspect that defendant's armed. How does he let defendant get the advantage over him to a point where he can be stabbed eight times? We'll never know. And so the record won't answer that question for us. You only have a few minutes left. Do you want to address the excited utterance? Let's go there. I was just going to ask you, can I go to the excited utterance? So we're only asking, the only issue, right, the only dispute is was it sufficiently startling? It's important that we're talking about an abusive discretion standard, okay? Was the trial court's determination fanciful, irrational? Basically, again, could no reasonable person ever find that this was an excited utterance, a startling situation? And I think to be under siege in your own home, your own apartment, is a pretty startling situation. You've got a guy out there that is acting nuts like a lunatic, just screaming and doing all these crazy things. You've got a building full of people that are at risk of encountering this guy and perhaps being hurt. I just don't think that on this record you can say that the trial court's finding is totally irrational, unreasonable, fanciful, all the words that show just how much deference we give to that trial judge sitting there making the call on admission. And, you know, that's really, that's really, I think, the bottom line, right? And, yeah, you know, we look at cases where someone is across the, now if he was in his third floor apartment and he saw this going on and he's calling 911, well, I don't think we've got, I don't think we've got that startling situation. But here we've got him under siege. Under siege one way or the other, because his apartment's the first one by the door. So defendant may not be in yet, but he's trying to get in. And where's he going to go? Wherever he's going to go, it's going to be right next to or right where the defendant is. And if he can get through the first door, why can't he get through the second? Okay, and now I've, you know, so I was going to talk about calling the police, but that's kind of what we're talking about, so we'll leave that. So to regroup here, I think when we look at the circumstances and we consider the appropriate standard of review being abuse of discretion, I don't think we can say the trial court's decision was fanciful. Any questions on the prosecutor? Nope, nothing further? And thank you very much, counsel. Okay, can I just say please affirm? Thank you. Thank you, Your Honors. A lot of the specifics are covered in the brief, so I'll try and keep my points relatively brief. And I'm going to focus on the sufficiency of the evidence claim. So Justice McPhee, you asked a couple of questions clarifying the record. The first was about whether there was some agnosticism expressed by the trial court as to whether the pepper spray or the knife came first. There was, to the extent there was, that agnosticism is not justified by the record. So both of the eyewitnesses and Mr. Houston's own 911 call said that there was no visible weapon at the time Houston left the safety of his apartment to pepper spray Mr. Jones. So there's simply nothing in the record that supports any confusion about the order of operations when it comes to the initial use of the pepper spray. Justice McPhee, you also asked about the trial court's findings related to the pepper spray being an offensive or defensive weapon. The trial court also was agnostic on that point, found that it could be both offensive and defensive, but expressly found that it would have the capacity to aggravate any situation in which it was used. And of course we know it did in this case. Turning to a little bit more of a broader point, we certainly do not shy away from the standard of review, but I think one of the things to consider when thinking about the sufficiency standard is what the trial court's finding of second-degree murder necessarily means. So the state took a lot of time to sort of cast doubt on Mr. Jones's testimony, but in order to find him guilty of second-degree murder in the first place, it must have credited at least a substantial portion of it. And so to the extent that the standard of review has any role to play, the trial court has already resolved a lot of those questions for this court by finding Mr. Jones guilty of second-degree murder in the first place. The only real question left on appeal is whether its legal conclusions about his presence at the front door and the reasonableness of his belief in the need for self-defense are supported by any case law. I would submit that they are not, and the court's conclusions on that ground are unreasonable. A couple of the state's points on specifics I do want to respond to. First, the state argues in sort of justifying Mr. Houston's actions that he may have been responsible for other people at the time he called 911 and used pepper spray. That assertion is directly contradicted by the 911 call itself. Mr. Houston is asked by the operator whether Mr. Jones is doing anything to his girlfriend who lives in the building. He says no. Mr. Houston only says that Mr. Jones is threatening me or threatening staff. There's no evidence that any other staff were on the premises that day. So to the extent that the state tries to justify Mr. Houston's decision to leave his position of relative safety based on the need to protect others, that is not borne out by the record either. I will point out the state argues that Mr. Houston's actions were reasonable both in terms of the excited utterance exception and reasonable doubt because he was under siege in his apartment building. I do want to return briefly to the timeline that we started this case talking about. So we know, again, that Mr. Jones was on the stoop for only about two and a half minutes. We know that a minute and 40 seconds of those two and a half minutes were taken up with the 911 call itself. So that's 50 seconds for Mr. Houston to register that Mr. Jones is on the front stoop, decide what he wants to do about that, and decide to call 911 and act after the 911 call. So 50 seconds for both pre-911 call and post-911 call decision making. So this isn't a situation where Mr. Houston was out of options by the time that he decided to, again, leave his position of relative safety to pepper spray Mr. Jones. I would submit he probably waited no more than 20 to 30 seconds, based on this record, before leaving his apartment to engage in an aggravated battery of pepper spraying Mr. Jones in the face. And just two more points, kind of zooming out to sort of broader problems with the state's argument. The state argues about the mismatch in the degree of injury between Mr. Houston and Mr. Jones. That's going to be a necessary feature of every self-defense case. The defendant in a self-defense case necessarily has to have gotten the better of the fight in order for there to even be a question. And more importantly, the only case the state cites for the mismatch in injury is Dellick, which again, we explained in the reply brief, is not citable. And as we cited, Woods and Estes, the defendant doesn't have to wait for a weapon to be drawn to use deadly force because of the size differential that was present in this case. So it wasn't just that Mr. Houston did eventually get the knife. That certainly matters. But Mr. Jones' actions were justified before that even happened based on the size differential and the physical battery that he was experiencing during the altercation. And one final point, the state's argument as to the reasonableness of the belief in the need for self-defense, specifically about Jones' belief that a woman named Sarah was being sexually assaulted, essentially carves a gaping animus exception into the defense of self-defense. Under the state's theory, taken to its logical conclusion, no person who harbors ill will towards someone else could ever invoke self-defense because their ill will will immediately be used against them to cast them as the initial aggressor. But any ill will that Mr. Jones had towards Mr. Houston had not been expressed towards Mr. Houston, at least as far as the record reveals. And under Cruz, that is a critical fact in rejecting a claim of self-defense. So again, I'll end where I ended my first discussion of reasonable doubt, which is with people versus white. The state is charging Mr. Jones with using inerrable judgment in the space of 60 seconds after being pepper sprayed, a circumstance the trial court acknowledged was aggravating. That is not what the law requires. And the trial court erred in finding Mr. Jones guilty of second-degree murder. So for those reasons, and again, the reasons we've discussed this morning, we would again ask this court to reverse and remand for a new trial or vacate the sentence and remand for resentencing. If there are no questions, thank you very much. Thank you both. The court will take this matter under advisement, and you will hear from us in due course. And the court is now adjourned, but we're going to stay here for a minute for other reasons.